**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **BRENDA LEE BROWN,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:12-CV-93 (HL) |
| **GEORGIA   DEPARTMENT   OF
DRIVER SERVICES**, | |
| Defendant. | |

**ORDER**

Before the Court are Defendant's Motion for Summary Judgment (Doc. 20) and Plaintiff's Motion to Strike Affidavits (Doc. 29). For the reasons stated below, Defendant's motion is granted, and Plaintiff's motion is denied.

**I.     Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must evaluate all of the evidence,

together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; *see also* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. *See* Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Local Rule 56, the facts listed in the movant's statement of material facts will be deemed admitted as undisputed unless the non-movant denies each

specific fact and provides a supporting citation to the factual record. M.D. Ga. L.R. 56. However, even if the non-movant fails to offer adequate objections under Local Rule 56, a court may not accept at face value the movant's depiction of the facts. United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101-02 (11th Cir. 2004). A court must review the record to determine for itself whether the motion for summary judgment is supported by the evidence and that there is no genuine issue of material fact. Id.; see also Reese v. Herbert, 527 F.3d 1253, 1268-69 (11th Cir. 2008).

## II.    Factual Background

This case arises from the termination of Plaintiff Brenda Brown's ("Plaintiff") employment with Defendant Georgia Department of Driver Services ("DDS"). In her response to DDS' Statement of Undisputed Material Facts, Plaintiff argues that many of the material facts are in dispute, but she fails to provide record citations that would actually place these facts into genuine dispute. Plaintiff's pro se status in this case does not free her from the obligation to comply with the "procedural rules in ordinary civil litigation." McNeil v. United States, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); see also Giles v. Wal-Mart Distrib. Ctr., 359 F. App'x 91, 93 (11th Cir. 2009). Any fact in DDS' statement of material facts that has not been disputed by Plaintiff with a

relevant record citation is, therefore, deemed admitted unless the Court's own review of the record calls the fact into dispute.

On April 1, 2010, Plaintiff began working as a Driver Examiner I at the DDS customer service center in Valdosta, Georgia, which on average served two hundred customers per day. (Defendant's Statement of Undisputed Material Facts ("DSMF"), Doc. 20-2, ¶¶1, 3; Plaintiff's Deposition, Doc. 20-10, pp. 57, 324). As the manager of the service center, Mary Mitchell ("Mitchell") was Plaintiff's direct supervisor and oversaw the driver examiners in that office. (DSMF, ¶¶2, 4-5). Mitchell reported to the district manager, Donna James ("James"), until January 1, 2011, when James became the manager of the Cordele customer service center. (Id. at ¶6). As the field coordinator, Donna Garnto ("Garnto") directly supervised the district managers and reported to the division's director, Alan Watson, who was responsible for making termination decisions and approving requests for contingent leave. (Id. at ¶¶7-9).

The responsibilities for the Driver Examiner I position included setting up and operating office and licensing equipment, conducting vision screening, processing documents, and administering written and driving tests to applicants. (Id. at ¶12). Every driver examiner was expected to perform all of these functions, particularly at the Valdosta service center with its high customer volume. (Id. at

¶13). The Valdosta office only had six driver examiners on staff, including Plaintiff. (Id. at ¶4).

Prior to interviewing for the driver examiner position, Plaintiff received a telephone call from Jackie Upchurch ("Upchurch") who worked in DDS' human resources department.[1] (Plaintiff's Deposition, pp. 63-64). When Upchurch said a driver examiner's position was open, Plaintiff expressed concern that her menorrhagia condition, which involved heavy bleeding during her menstrual period as well as having a longer than average period, would hinder her job performance. (Id. at 67-70, 141-43). Upchurch reassured Plaintiff that she would be replacing a retired employee whose job had been stationary and involved remaining at a window to provide information to customers. Upchurch understood Plaintiff would have similar duties. (Id. at 117-18).

During the interview process, Plaintiff also addressed her bleeding condition. She listed herself as disabled on a DDS questionnaire form and indicated she would need to stay seated during her menstrual period more than most employees. (Id. at 70-71). Plaintiff reviewed the questionnaire with the two DDS employees who interviewed her,[2] but when she spoke with Mary Mitchell on

---

[1] There is nothing in the record indicating Upchurch's precise position with DDS, including whether she actually had any personal knowledge about driver examiners' responsibilities or had the authority to set such job requirements. There is also no evidence Upchurch ever worked in the Valdosta service center.

[2] Plaintiff does not have a copy of the questionnaire, and she cannot remember the names of the interviewers. (Plaintiff's Deposition, pp. 64-66, 212-13).

the day of the interview, she did not mention her medical condition or accommodation request. (Id. at 209-13).

Although Plaintiff's work at DDS initially involved only administering road tests and sitting at the front desk providing information, circumstances soon required her to learn and to perform other duties. (Id. at 119-20, 140-41). When other driver examiners complained that Plaintiff was only sitting at the desk without doing the other tasks, forcing them to assume an unequal share of the workload, Donna James and Mitchell told her she would have to start performing all of the functions of the Driver Examiner I position, including administering vision screens and processing paperwork. (Id. at 119-20, 125-26, 152-54). Plaintiff asked James and Mitchell if, while she was menstruating, her work duties could be "lighten[ed] up" so that she could sit at a desk without having to walk around, which worsened her bleeding. (Id. at 181-92).[3] The supervisors denied Plaintiff's request because "everybody would have to … do the same work." (Id. at 184-85, 188-90). James also told Plaintiff she had to learn all the duties in case one of the other driver examiners was unavailable. (Id. at 152-54).

Plaintiff's bleeding condition harmed her work performance, and medical procedures were unable to improve her health during her time at the DDS. The

---

[3] Both Mitchell and James deny Plaintiff ever made such a request to them and declare they could not have approved such a request since each driver examiner was needed to perform all of the functions of that position. (Affidavit of Donna James, Doc. 20-6, ¶¶7-9; Affidavit of Mary Mitchell, Doc. 20-7, ¶9). For summary judgment purposes, the Court must accept as true Plaintiff's testimony about the alleged conversations.

loss of blood during her menstrual period caused fatigue; mental confusion; and loss of memory, appetite, and sleep. (Id. at pp. 192-93, 207). The blood flow was sometimes so large it would soak Plaintiff's pants and work seat, causing her intense embarrassment. (Id. at 141-42, 195-96). Plaintiff missed seven to eight work days in August 2010 when she underwent an ablation, but the attempt to stanch the blood loss was unsuccessful. (Id. at 217, 225-27, 239-41). She was also absent from work in November when she had to be hospitalized for heart palpitations caused by heavy bleeding, but she continued getting paid during both absences. (Id. at 241-44). Plaintiff eventually learned she required a total hysterectomy that would involve an estimated six weeks absence from work for the operation and recovery, and she applied for medical leave. (Id. at 244-46).

Plaintiff's requested leave for a hysterectomy that would take place on February 8, 2011 with an expected return on March 24 was subject to DDS' policies. (DMSF, ¶¶62-63). Under DDS' written policies, if an employee needed leave for a medical procedure, she must request and receive advance approval from her supervisor, if available, or the next person in the chain of command. (Id. at ¶17). If an emergency prevented the employee from getting advance approval, she was to alert her supervisor as soon as possible. (Id. at ¶18). An employee was required to return to work the workday immediately following the expiration

of leave, and any request for an extension had to be made in writing prior to the expiration of leave and give a return to work date. (Id. at ¶¶16, 19-23).

Even if an employee had exhausted her paid leave, she could apply for leave without pay, but such requests could only be approved in writing by the division director. (Id. at ¶26). Upon receiving leave without pay, an employee was required to submit a certified statement from her medical provider that she could return to work at the end of the approved leave and perform the essential functions of her job. (Id. at ¶27). An employee's failure to abide by the DDS policies could result in the termination of her employment. (Id. at ¶¶16, 24, 28). DDS informed Plaintiff of some policies during her orientation and cautioned her she was responsible for acquainting herself with all of the policies through its intranet. (Id. at ¶14).

Although Plaintiff received approval for her medical leave through March 23, she lost her job with the DDS when she failed to return to work after the leave expired. (Id. at ¶¶69-79). She had exhausted her paid medical leave on February 28, but was allowed to remain on leave and began receiving short-term disability benefits. (Id. at ¶¶69-70). The hysterectomy was successful, but complications lengthened Plaintiff's recovery beyond March 23. (Plaintiff's Deposition, pp. 296-99). She asked for an extension of leave and submitted a work excuse form from Specialty Clinics Diabetes Management stating she should not return to work

before March 30, when she had a follow-up medical appointment. (DSMF, ¶¶71-72). Plaintiff never provided DDS with a certified statement from a medical provider regarding when she could return to her full duties, and Alan Watson as the division director never approved a leave extension. (Id. at ¶¶67, 72-78). After Plaintiff failed to return to work on March 24, DDS terminated her employment. (Id. at ¶¶67, 74, 77-80). Plaintiff continued receiving disability benefits until August 6, 2011, and she applied for Social Security disability benefits in December 2011. (Plaintiff's Deposition, pp. 292-96, 383-84).

Plaintiff sought legal recourse for the loss of her job. After first completing an intake questionnaire on January 3, 2012, she filed a charge of discrimination against the DDS with the Equal Employment Opportunity Commission ("EEOC") on April 10, 2012, alleging that the department had discriminated against her on the basis of her age and disability. (Id. at pp. 326-27; DSMF, ¶81). After the EEOC issued a right to sue letter to Plaintiff, she filed suit in this Court and brought claims for violations of the Americans with Disabilities Act ("ADA"), 42. U.S.C. § 12101 *et seq.*, and the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 791 *et seq.*

## III.   Legal Analysis

Defendant's motion for summary judgment on Plaintiff's ADA and Rehab Act claims is granted. To the extent Plaintiff has ever sought to articulate

additional claims, her efforts were futile since she never moved to amend her complaint.[4] *See* St. George v. Pinellas County, 285 F.3d 1334, 1337 (11th Cir. 2002) ("The scope of the review [for whether a complaint sufficiently alleges a claim] must be limited to the four corners of the complaint."). The complaint only contains "a short and plain statement of the claim[s]" for violations of the ADA and the Rehab Act. Fed. R. Civ. Pro. 8(a)(2).

### A. ADA Claim

Summary judgment on the ADA claim is granted because Plaintiff failed to file a discrimination charge with the EEOC within the time required by law. "In order to litigate a claim for discrimination under Title VII, the ADA, or the ADEA a plaintiff must first exhaust [her] administrative remedies, beginning with the filing of a charge of discrimination with the EEOC." Rizo v. Ala. Dep't of Human Resources, 228 F. App'x 832, 835 (11th Cir. 2007). In Georgia, which is a non-deferral state, a plaintiff must file her charge with the EEOC within 180 days after the employment discrimination occurred. *See* Pijnenburg v. West Ga. Health Sys., Inc., 255 F.3d 1304, 1305 (11th Cir. 2001); 29 C.F.R. § 1626.7. Failure to

---

[4] DDS points out that, at various points during discovery, Plaintiff also referred to claims for violations of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Genetic Information Nondiscrimination Act, and the Family Medical Leave Act. (Defendant's Brief in Support of its Motion for Summary Judgment, Doc. 20-1, p. 2 n. 2). Since Plaintiff never amended her complaint to include any of these claims, despite the Court's clear deadline for doing so, (Scheduling/Discovery Order, Doc. 11, p. 6), analyzing the legal merits of these purported claims is unnecessary. In any event, the Court is convinced the factual record would not support such claims.

timely file a charge with the EEOC will result in the dismissal of a later lawsuit. *See* Rizo, 228 F. App'x at 836. Generally, a plaintiff must allege in her complaint that a charge was timely filed with the EEOC, and when a defendant denies that the filing requirement was met, the burden shifts to the plaintiff to prove that it was. *See* id.

Plaintiff did not exhaust her administrative remedies prior to filing this lawsuit because she did not file a charge with the EEOC within 180 days of the alleged employment discrimination. The latest date on which Plaintiff might have suffered discrimination was March 24, 2011, the day DDS fired her. Therefore, the deadline for filing an EEOC charge was September 20, 2011. Since Plaintiff did not even fill out an intake questionnaire from the EEOC until January 3, 2012, and did not complete the discrimination charge until April 10, 2012, (Doc. 20-23), her ADA claim in this lawsuit must be dismissed as time-barred.[5] Any ADA claim Plaintiff brought to this Court was doomed *ab initio*, regardless of whether Plaintiff alleged DDS fired her because of a disability or failed to provide reasonable accommodation for the disability.

---

[5] Although Plaintiff listed "01/03/2011" on one EEOC form, which would have been before the deadline for filing an EEOC charge passed, she admitted during her deposition that she wrote the date in error, and the collateral evidence proves she actually filled out the form in 2012. (Plaintiff's Deposition, pp. 326-27).

### B.    Rehab Act Claims

Even though Plaintiff filed her Rehab Act claims with this Court in a timely manner,[6] the motion for summary judgment on them is granted nonetheless. Plaintiff has not clarified which sections of the Rehab Act provide the legal basis for her claims, but the most likely one is 29 U.S.C. § 794, which forbids state government departments receiving federal money from denying benefits to individuals on the basis of their disability.[7] *See* 29 U.S.C. § 794(b)(1)(B); Morales v. Ga. Dep't of Human Res., 446 F. App'x 179, 180 (11th Cir. 2011). Since the "standard for determining liability under the Rehabilitation Act is the same as that under the [ADA] … cases involving the ADA are precedent for those involving the Rehabilitation Act." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) (citations omitted).

To establish a *prima facie* case for disability discrimination under the Rehab Act, Plaintiff must show that (1) she suffered from a disability; (2) she was otherwise qualified for her position; and (3) DDS subjected her to unlawful discrimination as the result of the disability. Id. DDS targets its motion for summary judgment on the third element. Under a liberal construction of the

---

[6] Unlike with her ADA claim, Plaintiff, as a non-federal employee, was not required to first exhaust her administrative remedies, including the filing of a timely EEOC charge, before bringing her Rehab Act claims to this Court. *See* Swain v. Valdosta City School Dist., Civ. No. 7:12-cv-146, 2013 WL 486273, at *1 (M.D.Ga. Feb. 6, 2013); Ali v. City of Clearwater, 807 F. Supp. 701, 703 (M.D.Fla. 1992).

[7] As a recipient of federal funding, DDS concedes it is required to comply with the Rehab Act.

complaint in light of the record, Plaintiff alleges DDS violated the Rehab Act by failing to make reasonable accommodation for her disability and by terminating her employment because of her disability, but neither argument can withstand summary judgment scrutiny.

### 1.    Failure to accommodate Plaintiff's disability

Plaintiff's failure to accommodate claim is dismissed because she has failed to provide evidence creating a genuine issue of material fact and DDS is entitled to judgment as a matter of law. An employee suffers unlawful discrimination when her employer refuses to provide "reasonable accommodation" for her disability. Lucas v. W. W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (citations omitted). "The plaintiff bears the burden of identifying an accommodation" and showing it is reasonable. Id. at 1255-56.

An employer is not obligated to provide every accommodation an employee requests, only reasonable ones. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997) (citation omitted). Under the ADA, which by extension applies to the Rehab Act, reasonable accommodations could include "job restructuring, part-time or modified work schedules, reassignments to a vacant position, acquisition or modification of equipment or devices, … and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B); *see also* 29 C.F.R. § 1630.2(o). An accommodation is by

definition unreasonable if it poses an undue hardship on the employer or prevents the employee from doing the essential functions of her job. Lucas, 257 F.3d at 1255.

"[E]ssential functions 'are the fundamental job duties of a position that an individual with a disability is actually required to perform.'" Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1257 (11th Cir. 2007) (quoting Earl, 207 F.3d at 1365). How an employer defines the essential functions of a position must be given "substantial weight" by a court, which may consider testimony from an employee's supervisor. Id. at 1257-58. Whether a job function is essential may also depend on "the amount of time spent on the job performing the function, the consequences of not requiring the incumbent to perform the function, … the work experience of past incumbents in the job, and the current work experience of incumbents in similar jobs." D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1230 (11th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3)) (internal numbering omitted). There are at least three bases on which a job function might be deemed essential: "(1) the reason the position exists is to perform the function; (2) there are a limited number of employees available among whom the performance of the job function can be distributed; and (3) the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to

perform the particular function." Id. (internal quotation and citation omitted); *see also* 29 C.F.R. § 1630.2(n)(2).

Mindful that Plaintiff is proceeding in this action *pro se*, the Court is persuaded that Plaintiff made two requests to DDS for accommodation of her disability. First, Plaintiff asked her supervisors if her job duties could be limited to working at the front desk without having to do more active tasks such as administering driving tests and vision screens. Plaintiff initially sought to permanently restrict her job to desk work, but when this was not allowed, she requested this accommodation for when she was experiencing her menstruation, even if the accommodation were only for "one or two days." Second, Plaintiff asked DDS to accommodate her disability by extending her leave for recovery after the hysterectomy. DDS' denial of both requests did not violate the Rehab Act because the accommodations were not reasonable.

Limiting Plaintiff's job to only working at the front desk was not a reasonable accommodation since it would have prevented her from performing the essential functions of that position. Plaintiff does not dispute that as a driver examiner her job responsibilities included, *inter alia*, conducting vision screenings, administering written and road tests to license applicants, processing documents, and assembling and operating equipment. To prove how essential these functions were, DDS offers affidavits from Plaintiff's direct supervisor, Mary

Mitchell; April Harrison, who was a personnel technician in DDS' human resources office; and Alan Watson, who was the director of the DDS division in which Plaintiff worked. (Docs. 20-7; 20-5; 20-9).[8] Citing Mitchell's testimony, DDS points out that she relied on all six driver examiners being able to perform all of their duties in order to meet the high customer volume in Valdosta. Letting Plaintiff work from a desk would have unduly burdened the other driver examiners.

Plaintiff fails to convince the Court that administering road tests and vision screens, processing documents, and operating office equipment were not essential duties of her job. The only evidence even arguably indicating these were not essential responsibilities comes through Plaintiff's deposition testimony about statements made by a DDS employee named Jackie Upchurch.[9] Plaintiff does not know Upchurch's position with DDS apart from thinking she worked in the human resources office and contacted job applicants about the status of their applications. There is no evidence Upchurch ever worked in the Valdosta office. When Plaintiff mentioned the limitations created by her medical condition,

---

[8] The written job description provided by DDS has no bearing on what the essential functions of Plaintiff's job might have been since there is no evidence the description was created before she was interviewed or the job was announced. *See* D'Angelo, 422 F.3d at 1230.

[9] DDS has not objected to Plaintiff's testimony concerning Upchurch's statements. Even though the statements are *prima facie* hearsay, they may still be considered at the summary judgment stage since Plaintiff could reduce them to an admissible form at trial under Federal Rule of Evidence 801(d)(2)(D). *See* Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012).

Upchurch told her she would be replacing a retired employee who had worked stationary at a window, dispensing tickets and information to customers, and Plaintiff would be working under the same circumstances. At best, Upchurch's statements only indicate how a previous driver examiner had worked and her understanding of Plaintiff's duties. There is no evidence Upchurch had any basis for knowing what Plaintiff would be required to do at the Valdosta service center.

The overwhelming weight of the evidence shows that the essential functions of the Driver Examiner I position included active duties that Plaintiff could not perform while remaining seated. Plaintiff agrees she was expected to, and actually did, perform such tasks. DDS employees with knowledge of Plaintiff's work in Valdosta have provided evidence that the position of driver examiner involved essential responsibilities that could not be performed from a desk chair.   In contrast to the vague evidence concerning the work responsibilities of the retired employee whose position Plaintiff was hired to fill is the fact that the driver examiners with whom she worked were clearly performing active duties, and they complained when Plaintiff did not do all the tasks. If the essential functions of the Driver Examiner I position could be done by sitting at a desk, the Court wonders who would be administering the vision screens and driving tests for Georgia driver license applicants. *See* 29 C.F.R. § 1630.2(n)(2)

(directing courts to ask whether "the reason the position exists is to perform the function"). Not for nothing was Plaintiff hired to be a *driver examiner*.

How long Plaintiff might have wished to remain seated at a desk does not alter the Court's analysis. Whether Plaintiff wanted to be stationary for her entire menstrual period or for only one or two days is beside the point seeing she could not perform her essential functions while seated. Moreover, being stationary for only two days would have been negligibly useful to Plaintiff given her testimony that the time of heaviest bleeding would last for at least nine days and that active duties could trigger sudden blood flows during that time. (Plaintiff's Deposition, pp. 69-73, 141-43, 189-209). Because there is no genuine issue of material fact that administering road tests and vision screens, processing documents, and operating equipment were essential functions of the Driver Examiner I position, DDS did not unreasonably fail to accommodate Plaintiff's disability by refusing to permit her to remain at a desk. The length of the accommodation does not alter the inevitable conclusion that it was not reasonable.

DDS is also not liable for denying Plaintiff's request to remain on an extended sick leave, for this was not a reasonable accommodation of her disability. "While a leave of absence may be a reasonable accommodation, the ADA [and by extension the Rehab Act] does not require an employer to provide leave for an indefinite period of time because an employee is uncertain about the

duration of his condition." <u>Santandreu v. Miami Dade County</u>, 513 F. App'x 902, 905 (11th Cir. 2013) (citing <u>Duckett v. Dunlop Tire Corp.</u>, 120 F.3d 1222, 1226 (11th Cir. 1997)). "The ADA covers people who can perform the essential functions of their jobs presently or in the immediate future." <u>Wood v. Green</u>, 323 F.3d 1309, 1314 (11th Cir. 2003). While an employer might violate the ADA and the Rehab Act by immediately terminating an employee who requests a medical leave of absence, it is not required to continue approving repeated requests for indefinite leave. *See* <u>id.</u>

Accommodating Plaintiff's request to remain on leave even though she did not provide a certified medical opinion for when she could return to work would not have been reasonable. DDS had allowed Plaintiff to take two paid medical leaves before she took leave for her hysterectomy and recovery. Plaintiff exhausted the remainder of her personal and sick days while recovering from the hysterectomy, but DDS nonetheless allowed her to remain on leave and receive short-term disability benefits until her anticipated date of return on March 24. However, Plaintiff did not comply with DDS policies. When Plaintiff learned she could not return to work on March 24, she failed to provide a new medical certification for when she could return to DDS, only sending a work-excuse form stating she would be out until at least her doctor's appointment on March 30. The fact that Plaintiff continued receiving short-term disability benefits until August 6,

then subsequently applied for Social Security disability benefits, suggests she required indefinite leave well beyond March 30.

Allowing Plaintiff to remain on leave when the date of her return to work at full capacity was uncertain would have been unreasonable. DDS did not violate the Rehab Act by refusing to permit Plaintiff to remain on indefinite medical leave. Summary judgment on the failure to accommodate claim is granted.

### 2.    Termination of Plaintiff's employment

Plaintiff is not any more successful in alleging that DDS violated the Rehab Act by terminating her employment. Under the McDonnell Douglas burden-shifting analysis applied in the absence of direct evidence of unlawful discrimination,[10] once a plaintiff has presented a *prima facie* case under the Rehab Act, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for terminating the plaintiff. Wascura v. City of South Miami, 257 F.3d 1238, 1241-42 (11th Cir. 2001) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If the employer does so, the burden then swings back to the plaintiff to provide sufficient factual evidence to create a genuine issue of fact for whether the employer's proffered

---

[10] Plaintiff has not argued there is, and the Court has not found, direct evidence of discrimination in the record. *See* Wascura v. City of South Miami, 257 F.3d 1238, 1242 n. 2 (11th Cir. 2001) ("Only the most blatant remarks, whose intent could be nothing other than to discriminate will constitute direct evidence of discrimination.") (internal citation, quotation, and punctuation omitted).

reason was pretextual. Id. at 1243. A court must dismiss the claim if the plaintiff cannot carry her burden. Id.

DDS has met its burden because it offers evidence Plaintiff was fired for not complying with DDS employment policies. During orientation DDS briefed Plaintiff on its key policies and informed her she was responsible for acquainting herself with all the policies. Failure to follow the procedures laid out in the policies could result in the termination of employment. The record is undisputed that Plaintiff did not receive written approval for extending her leave beyond March 23, give DDS a certified statement from a medical provider stating a return to work date, or return to work on March 24 when her permitted leave expired. DDS now claims that it fired Plaintiff for these policy violations, which would certainly have been a legitimate rationale for the adverse employment action.

The burden now shifts to Plaintiff to show DDS' stated reason for firing her was merely pretextual, but she has not done so. Since DDS' proffered reason for firing her is one that might reasonably motivate an employer, Plaintiff must address the reason head on and rebut it. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004). She may do so "by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination."

Id. Plaintiff's brief opposing summary judgment does not appear to articulate any argument that DDS' proffered reason for firing her was pretextual. Assuming Plaintiff had made this argument, it is insufficient to create a genuine issue of material fact. There is no evidence DDS refrained from firing non-disabled employees who were otherwise similarly situated to Plaintiff. Nor is there evidence Plaintiff's supervisors, particularly Alan Watson who made the decision to fire her, possessed animus towards Plaintiff or any other employee on account of a disability.

Given Plaintiff's failure to argue that DDS' proffered explanation for her firing was pretextual, and this Court's own inability to uncover sufficient evidence to create a genuine factual dispute, Defendant's motion for summary judgment is granted for the claim it violated the Rehab Act by terminating Plaintiff's employment. Since none of Plaintiff's claims can survive summary judgment, her case is dismissed.

## IV.    Plaintiff's Motion to Strike Affidavits

Turning now to Plaintiff's motion to strike various affidavits submitted by DDS in support of the motion for summary judgment, the Court denies it as meritless. The rules of civil procedure and evidence allow a party to base its motion for summary judgment on affidavits so long as the witnesses providing the sworn statements have personal knowledge of the information contained

therein and the evidence would be admissible at trial. Fed. R. Civ. Pro. 56; Fed. R. Evid. 602. The affidavits from DDS employees in question meet the requirements of Rule 56(c)(4) and are in a form that is standard for civil litigation. Plaintiff's chief objection to the affidavits seems to be that "they improperly seek to introduce evidence to the record to contradict the testimony of the Plaintiff." (Motion to Strike Affidavits, Doc. 29, ¶1). There is nothing improper about the affidavits, and the fact that they might contradict Plaintiff's testimony is certainly not grounds for striking them.

## V.   Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 20) is granted, Plaintiff's Motion to Strike Affidavits (Doc. 29) is denied, and this case is dismissed.

**SO ORDERED**, this the 29th day of April, 2014.

*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

scr

23